❏ Original ❏ Duplic

**CLERK'S OFFICE**
**A TRUE COPY**
**Mar 20, 2024**
**s/ Mariah Kauder**
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information about the location of the cellular<br>telephone assigned call number 262-224-4619 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **24-M-360 (SCD)**

Matter No. 2023R00438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    4-3-24    *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Hon. Stephen C. Dries    .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ☑ until, the facts justifying, the later specific date of    09/16/2024    .

Date and time issued:    3-20-24. 11:00 am

*Stephen C. Dries*
*Judge's signature*

City and state:    Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to be Searched

1. Records and information associated with the cellular device assigned call number 262-224-4619 (referred to herein and in Attachment B as the "**Target Cell Phone**"), used by Juan Carlos Espinoza, aka Gordo aka Pedrito, with a listed subscriber of "Edgardo Isidro" that is in the custody or control of U.S. Cellular (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 8410 West Bryn Mawr Avenue, Chicago, Illinois 60631.

2. The Target Cell Phone.

1

## ATTACHMENT B

### Particular Things to Be Seized

Pursuant to an investigation of Juan Carlos Espinoza, aka Gordo, aka Pedrito, for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), this Warrant authorizes the officers to whom it is directed to determine the location of the **Target Cell Phone** by collecting and examining the following:

### I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 6, 2024, to the present:

i.   Names (including subscriber names, usernames, and screen names);

ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

2

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 6, 2024, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

3

c.  Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), involving Juan Carlos Espinoza, aka Gordo, aka Pedrito, and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

CLERK'S OFFICE
A TRUE COPY
Mar 20, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**Information about the location of the cellular<br>telephone assigned call number 262-224-4619** | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **24-M-360 (SCD)**

Matter No. 2023R00438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846;<br>and 843(b) | Distribution and possession with the intent to distribute controlled substances;<br>Conspiracy to distribute and possess with the intent to distribute controlled<br>substances; and Illegal use of a communication facility. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _180_ days *(give exact ending date if more than 30 days:_09/16/2024_)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrew Langer, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

___telephone___ *(specify reliable electronic means)*.

Date: 3-20-24

*Judge's signature*

City and state:  Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Andrew Langer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application for an extension of a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **262-224-4619** ("**Target Cell Phone**"), known to be used by Juan Carlos Espinoza, aka "Pedrito," aka "Gordo," and whose service provider is U.S. Cellular, a wireless telephone service provider ("Service Provider") headquartered at 8410 West Bryn Mawr Avenue, Chicago, Illinois 60631. The listed subscriber for this phone number is "Edgardo Isidro." The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I have been employed with the Milwaukee Police Department as a full time sworn police officer for eight years. I am currently assigned as a task force officer (TFO) with the Milwaukee Area Safe Streets Task Force (MASSTF) and the Federal Bureau of Investigation (FBI)

1

Milwaukee Field Office. In August 2023, I was officially sworn in as a federal task force officer to work with MASSTF, which provides me with the authorization to present sworn affidavits in support of federal search warrant applications. I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of controlled substances laws to include other violations associated with the trafficking of controlled substance. I have participated in numerous drug investigations utilizing various means of investigation including but not limited to, the execution of search warrants, the use of subpoenas, the use of informants, and the use of GPS and other location data.

4. As a federal task force officer and local police officer, I have participated in the investigation of narcotics-related offenses resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and

2

practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.     The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. The information is based, in part, upon my training and experience, as well as information provided to me by another agent with specialized training in cell phone tracking, cell towers, etc.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that (1) violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility) have been committed, are being committed, and will be committed by Juan Carlos Espinoza, aka Gordo, aka Pedrito; (2) the location information described in Attachment B will constitute evidence of these criminal

3

violations and will lead to the identification of other individuals who are engaged in the commission of these offenses with Juan Carlos Espinoza, aka Gordo, aka Pedrito. Juan Carlos Espinoza, aka Gordo, aka Pedrito is using the **Target Cell Phone** and but is not the listed subscriber; and (3) the location of the **Target Cell Phone** will assist law enforcement in obtaining the **Target Cell Phone**, which contains evidence of those criminal violations. I know from training and experience that cell phone users normally have their cell phones with them, so locating a user's cell phone will show that user's location. I believe that locating the **Target Cell Phone** will constitute and lead to evidence of the federal offenses listed above.

8. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. I am currently working with a Confidential Human Source (CHS), who I believe is reliable and credible. Since approximately July 2022, the CHS has provided information to law enforcement officers concerning criminal activity in the Milwaukee, WI area. The CHS' information has been accurate and corroborated, in part, by: (a) my knowledge of violent gang members in the Milwaukee, WI area; (b) intelligence gathered from other Milwaukee gang investigations through controlled narcotics purchases and consensually recorded phone calls; (c) independent investigation including surveillance; and (d) information from other confidential sources. The CHS is cooperating with case agents for monetary compensation. CHS is a convicted felon with prior convictions for Burglary, Operating a Motor Vehicle Without Owner's Consent,

4

Battery, and Possession with Intent to Deliver Narcotics. As detailed below, the CHS has conducted at least four controlled buys of cocaine on behalf of case agents. After the first controlled buy, I met with the CHS and the CHS made statements about what occurred during the buy. I then reviewed audio/video footage made by the CHS of the transaction and found that it was consistent with the CHS' statement. The recording device for the second controlled buy did not record and, therefore, I was unable to review it to compare with the information provided by the CHS. However, surveillance observations by case agents during the second controlled buy were consistent with the information provided by the CHS. I have reviewed recordings made by the CHS of the third controlled buy detailed below and they are consistent with the information provided by the CHS as to what occurred. For these reasons, I believe the CHS is credible and reliable.

10.     I am participating in an investigation targeting a Drug Trafficking Organization, dubbed the Botello DTO. The DTO is responsible for the distribution of cocaine and methamphetamine within the Eastern District of Wisconsin. To date, case agents have identified several culpable parties involved in the DTO including Roberto Aviles-Rogel, Marco Medel and Juan Carlos Espinoza, aka Gordo, aka Pedrito. Case agents are currently utilizing a ping warrant and pen register trap and trace order for Roberto Aviles-Rogel's phone (847)641-6044, that was authorized by a Federal Magistrate Judge in the Eastern District of Wisconsin. Case agents are also intercepting wire and electronic communications for Marco Medel's phone (414)499-6919 pursuant to a court-ordered TIII. As part of that TIII order, case agents are also currently receiving location data for Medel's phone. Prior to the authorization of the TIII in February 2024, case agents had a ping warrant and pen register/trap and trace for this number as well. Case agents also

5

identified El Infierno Bar as a location frequently patronized by the targets of this investigation. El Infierno Bar is located at 2000 W. Historic Mitchell Street, Milwaukee, WI.

## TITLE III AUTHORIZATION FOR ROBERTO AVILES-ROGEL-(847)641-6044

11. On Monday, February 5, 2024, case agents obtained a Title III order (24-AP-1) authorizing the interception of calls and electronic messages to and from Roberto Aviles-Rogel at (847)641-6044. The order was signed by the Honorable Brett Ludwig of the Eastern District of Wisconsin and served to T-Mobile on the same date. Interception began that afternoon. Along with monitoring incepted calls and electronic messages to and from Roberto Aviles-Rogel (847)641-6044, case agents continued employing other investigative methods such as physical surveillance, pole camera surveillance, and a controlled drug buy utilizing the CHS. Interceptions of Aviles-Rogel's phone ended on March 5, 2024.

## TITLE III AUTHORIZATION FOR MARCO MEDEL-(414)499-6919

12. On Tuesday, February 20, 2024, case agents obtained a Title III order (24-AP-2) authorizing the interception of calls and electronic messages to and from Marco Medel at (414)499-6919. The order was signed by the Honorable Brett Ludwig of the Eastern District of Wisconsin and served to T-Mobile on the same date. Interception began that afternoon. Along with monitoring incepted calls and electronic messages to and from Marco Medel (414)499-6919, case agents continued employing other investigative methods such as physical surveillance, pole camera surveillance, and a controlled drug buy utilizing the CHS. Interception of Medel's phone communications is ongoing.

## TITLE III AUTHORIZATION FOR VICTOIANO BOTELLO-(414)399-7825 and (414)406-8785

6

13. On Wednesday, March 13, 2024, case agents obtained a Title III order (24-AP-4) authorizing the interception of calls and electronic messages to and from Victoriano Botello at (414)399-7825 and (414)406-8785. The order was signed by the Honorable Brett Ludwig of the Eastern District of Wisconsin and served to T-Mobile on the same date. Interception began that afternoon. Along with monitoring incepted calls and electronic messages to and from Victoriano Botello, (414)399-7825 and (414)406-8785, case agents continued employing other investigative methods such as physical surveillance, pole camera surveillance, and a controlled drug buy utilizing the CHS. Interception of Victoriano Botello's phone communications is ongoing.

**Controlled Buy**

14. On February 6, 2024, I met with the CHS for the purpose of contacting Roberto Aviles-Rogel at (847)641-6044 in order to obtain prices for crystal methamphetamine. All of the telephone calls and text messages between the CHS and (847)641-6044 as detailed in this section were recorded with CHS#2's full knowledge and consent. At 10:51 AM, The CHS called (847)641-6044, however the call went to voicemail. The CHS left a message requesting Roberto Aviles-Rogel call the CHS back. This call was placed in my presence, and I verified that the CHS dialed (847)641-6044. At 10:53 AM, the CHS sent an electronic message to (847)641-6044: Partner of mine needs the big picture window replaced how much for the glass.

15. This message was sent in my presence and was in English. I know that "window" and "glass" are both street terms in reference to crystal methamphetamine.

16. At 12:20 PM, Robert Aviles-Rogel utilizing (847)641-6044 responded to the CHS via electronic message: The size its 23 inches. This message was in English, and I believe based on

this message exchange that the CHS asked Aviles-Rogel for one pound of methamphetamine and Aviles-Rogel gave a preliminary price of $2,300.

17.     Later, at approximately 5:23 PM, Aviles-Rogel contacted the CHS utilizing (847)641-6044. The call was intercepted on the TIII and recorded.  This call was answered by the CHS. The following is an approximate translation of that conversation. The CHS tells Aviles-Rogel that the CHS will see him out front. Aviles-Rogel questions, "El Infierno?" CHS#2 affirms.

18.     During that call, Aviles-Rogel and the CHS agree to meet in person out in front of El Infierno Bar.  I then met with the CHS and provided the CHS with audio recording equipment. Physical surveillance was established outside of El Infierno Bar. TFO Kyle Veloz identified Roberto Aviles-Rogel parked in front of El Infierno Bar. At approximately 6:05 PM, the CHS arrived and was observed by case agents entering Roberto Aviles-Rogel's vehicle. While in the vehicle, the CHS and Aviles-Rogel discussed the price for crystal methamphetamine. This conversation was recorded and was in Spanish and subsequently translated into English. The approximate translation is below.

### IN PERSON MEETING BETWEEN the CHS and AVILES-ROGEL:

**CHS:** How much for a white one?

**Aviles-Rogel:** Questions who CHS is with

**CHS:** My dad. What about the price for crystal? Can you get Crystal methamphetamine? How much is a pound of that?

**Aviles-Rogel:** Crystal?

**CHS:** Confirms. What about the price of that.

**Aviles-Rogel:** 3,500

**CHS:** That much, damn. That's really not that bad. How much is the cheapest that you can get it for me?

8

**Aviles-Rogel:** 3,500

**CHS:** 35

**Aviles-Rogel:** Crystal

*****the CHS and Aviles-Rogel continued discussing the prices as well as unrelated matters.*

19. Based on my training and experience, I believe that during the in-person meeting, the CHS asked Aviles-Rogel about the prices for a pound of crystal methamphetamine. Aviles-Rogel replied, "Crystal?" the CHS affirmed. Aviles-Rogel replied, $3,500. I believe that this conversation was a preliminary conversation between the CHS and Aviles-Rogel to negotiate a future methamphetamine deal.

20. At approximately 6:11 PM, shortly after the CHS exited Aviles-Rogel's vehicle, Aviles-Rogel utilizing (847)641-6044 called Marco Medel's phone, 414-499-6919. The call was intercepted and recorded. In the background of the call was music consistent with Medel being at the bar and Medel's phone location data (414-499-6919) was also consistent with it being at El Infierno Bar. During the call, Aviles-Rogel asked if Medel is in the bar. Medel affirmed that he is in the bar. TFO Veloz observed Aviles-Rogel enter El Infierno Bar at approximately 6:12 PM. During this time, TFO Ploch was monitoring Medel's pen register (414-499-6919). At 6:16 PM, Medel's phone (414-499-6919) was in contact with Mexico phone number, 52.677.107.3715.

21. From this and based on my training and experience in drug investigations, I believe that: Aviles-Rogel called Medel (at 414-499-6919) directly after meeting with the CHS to advise him of the potential methamphetamine deal. After learning that Medel was at El Infierno Bar, Aviles-Rogel entered the bar to talk to him in person. I believe that Medel then spoke with his Mexico-based source to advise him/her of the methamphetamine sale.

9

22. Beginning at 7:24 PM, case agents intercepted the following electronic message exchange between Roberto Aviles-Rogel ((847)641-6044) and the CHS. These messages were in English:

**Aviles-Rogel (TT1):** ???

**Aviles-Rogel (TT1):** I got the glass ready

**CHS:** Tomorrow evening I should have enough to cover the labor cost and the cost of the picture window have a good night

**Roberto Aviles-Rogel (TT1):** Souns good

23. I know that "Glass" is a street term for methamphetamine. I believe this electronic message exchange represents Aviles-Rogel confirming with the CHS that he has arranged for, and is available to complete, the methamphetamine sale. Aviles-Rogel did not leave the bar between the time he entered and the time he messaged the CHS that the "glass" (methamphetamine) was ready. Based on this, I believe that Medel facilitated this transaction with Aviles-Rogel while inside El Infierno Bar.

24. On February 9, 2024, I met with the CHS for the purposes of conducting a controlled buy of crystal methamphetamine from Aviles-Rogel. Based on case agents' knowledge of the investigation, we believed that Aviles-Rogel would contact Medel to source the methamphetamine. I met with the CHS prior to the buy. the CHS was searched for money and/ or contraband finding none. the CHS placed a call to Aviles-Rogel at (847)641-6044. This call was done in my presence and was recorded. The following is a summary of that call, which was translated by an FBI Linguist and intercepted via the TIII on (847)641-6044.

**10:49 AM (Session 1020-Voice Call)**

10

**CHS:** I want to put the glass in the house and get the wooden board out. What time can we meet at Home Depot.

**AVILES-ROGEL**: At 1pm

**CHS:** Affirms.

### 10:51 AM (Session 1021-Voice Call)

**CHS**: Can you do the window right now, 1pm is too late, he is working 2nd shift. Can it be done earlier.

**AVILES-ROGEL**: 12pm?

**CHS**: Affirms

25.    I believe that these conversations represent Aviles-Rogel agreeing to sell the CHS the crystal methamphetamine previously discussed on February 6, 2024.

26.    Immediately after the two calls between the CHS and (847)641-6044, Aviles-Rogel, utilizing (847)641-6044, called Marco Medel at 414-499-6919. This call was intercepted via the TIII on (847)641-6044.  This call occurred at 10:52 AM. Medel did not answer the phone. Aviles-Rogel, utilizing (847)641-6044, then sent a series of electronic messages to Medel at 414-499-6919. Below are the electronic messages sent to Medel at 414-499-6919 (which were intercepted via the TIII on (847)641-6044).  These messages were in Spanish and translated to English by an FBI translator.

**AVILES-ROGEL** (session 1023; 10:52am): Fucker

**AVILES-ROGEL** (session 1025; 10:53am): My buddy wants me to bring the window at 12.

**AVILES-ROGEL** (session 1027; 10:53am): Talk to me faggot

11

27.     Following these messages, Aviles-Rogel ((847)641-6044) attempted to call Medel (at 414-499-6919). This call was intercepted via the TIII on (847)641-6044 and occurred at 10:54 AM. I believe that Aviles-Rogel was attempting to pick up methamphetamine from Medel. Based on pen register/trap and trace and ping data for Medel's phone (414-499-6919) case agents believe Medel was sleeping as he was not answering phone calls.

28.     After the numerous attempts to reach Medel at 414-499-6919, Aviles-Rogel ((847)641-6044) contacted (414)688-7554, an unidentified number not previously known to case agents. That call was intercepted via the TIII on (847)641-6044 and translated from Spanish. The following is an approximate summary of that call.

**10:58 AM (Session 1030-Voice Call)**

**Aviles-Rogel:** Greets Pedrito

**7554:** I am down listening to music, I got out to run some errands and now I am back.

**Aviles-Rogel:** I am calling fucking Periquillo [note: this is likely a nickname, meaning coke head, that case agents believe is in reference to Medel] but he is not answering. Periquillo was going to give me a pound of window, but he is not answering as he got drunk last night. I told him about it last night.

**7554-** I have some if you want.

**Aviles-Rogel:** What is the price.

**7554-** What price was Pariquillo going to give you?

**Aviles-Rogel:** 2.5

**7554:** That is fine,

**Aviles-Rogel:** I am coming down because I need to meet the guy at 12

**7554:** Agrees to the price.

12

29.     I know that this conversation represents the user of 414-688-7554 agreeing to source Aviles-Rogel with methamphetamine because Medel was not answering his phone. This conversation confirms that Aviles-Rogel previously discussed this methamphetamine transaction with Medel. I know that TFO Ploch checked Pen Register data obtained from (847)641-6044 and 414-499-6919 and noted they both are in frequent contact with 414-688-7554, the methamphetamine supplier in this controlled buy.

30.     Following the series of calls and messages documented above, physical surveillance observed Aviles-Rogel leave 18650 W Lawnsdale Rd, New Berlin, WI.  He was followed directly to the area 2218 S. 21st Street without making any stops. He arrived on S. 21st Street at approximately 12:10 PM. At 12:20 PM, Aviles-Rogel left that residence and drove directly to the pre-determined meet location where he met with the CHS. He did not stop or meet with anyone along the way. At 12:30 PM, the CHS entered Aviles-Rogel's truck momentarily. At 12:33 PM, the CHS exited Aviles-Rogel's vehicle and left the parking lot. Aviles-Rogel was followed directly back to 2218 S. 21st Street.

31.     I again met with the CHS who turned over a plastic bag containing a crystal substance suspected to be methamphetamine. The CHS was searched for money and/ or contraband finding none. The CHS indicated that the CHS exchanged the pre-recorded buy money with Aviles-Rogel for the crystal methamphetamine. This buy was recorded with audio and observed by Officer Torres and me.  I can identify Aviles-Rogel as the person who met with the CHS inside the vehicle. Aviles-Rogel was the driver and sole occupant and was the only person who the CHS interacted with prior to returning to me with the methamphetamine.

13

32. I transported the methamphetamine to the FBI Office where Special Agent Shamsi weighed, and field tested it. The methamphetamine was tested with TruNarc and tested positive for the probable presence of methamphetamine. The methamphetamine was found to weigh 464.4 grams.

33. At approximately 2:07 PM, case agents intercepted via the TIII on (847)641-6044, a call followed by a series of messages between Aviles-Rogel ((847)641-6044) and Medel (414-499-6919). The messages were translated by an FBI translator and are indicative of further discussion between the two about the aforementioned methamphetamine deal. Hereafter, (847)641-6044 is referred to as TT1 and 414-499-6919 is referred to as TT2.

**2:07 PM (Session 1078-Voice Call)**

**Marco Medel (TT2):** I was watching a movie with my little daughter.

**Aviles-Rogel (TT1):** I texted you earlier because the guy was calling and calling me. He wanted to get the pound.

**Marco Medel (TT2):** I did not see anything.

**Aviles-Rogel (TT1):** I sent you a message.

**Marco Medel (TT2):** Where are you.

**Aviles-Rogel (TT1):** I went to get breakfast.

**Marco Medel (TT2):** I am not going out until 4pm.

**Aviles-Rogel (TT1):** I will see you later.

**2:07 PM-2:10 PM (Session 1079, 1081, 1084-Electronic Messages)**

**Marco Medel (TT2):** He no longer wants it?

**Aviles Rogel (TT1):** Gordo gave it to me.

**Marco Medel (TT2):** Ok, that's fine.

34. I know that the aforementioned voice and electronic message exchange between Medel (414-499-6919) and Aviles-Rogel ((847)641-6044) represent the two further discussing the pound

14

of methamphetamine deal. Directly after these messages, TFO Ploch viewed Medel's pen register/trap and trace (414-499-6919) data. As with the meeting described on February 6, 2024, after this series of messages with Aviles-Rogel, Medel's next phone activity (using 414-499-6919) was electronic messages to/from the Mexico-based phone number 52.677.107.3715. I believe that Aviles-Rogel used (847)641-6044 to contact Medel at 414-499-6919 to discuss this transaction, and that Medel used 414-499-6919 to contact his Mexican source of supply and update him/ her of the sale. I further believe that the methamphetamine previously in "Gordo's" possession was also owned by Marco Medel and Medel approved of Aviles-Rogel picking it from him when he responds, "Okay, that's fine."

## **ADDITIONAL CALL AND SMS TEXT ANALYSIS**

35. On February 13, 2024, the Honorable Magistrate Judge Stephen Dries authorized a warrant for data and location information related to (414)688-7554, the phone number used by "Gordo/Pedrito" to discuss the methamphetamine deal with Aviles-Rogel. This order was served on the service provider and case agents began receiving data shortly thereafter.

36. On February 13, 2024, at approximately 6:23 PM, phone number (414)688-7554 was pinging in the area of 2218 S. 21st Street, Milwaukee, WI. Case agents conducting surveillance observed an unknown male exit the residence and enter a grey Honda bearing Wisconsin plate AWV-3892. Case agents requested that uniformed Milwaukee Police Department officers conduct a traffic stop of the grey Honda. A traffic stop was conducted in the 2100 block of W. Grant Street, in Milwaukee, Wisconsin. During the traffic stop, the GPS ping for (414)688-7554 was showing in the 2100 block of W. Grant Street. The operator of the grey Honda identified himself as Juan C. Espinoza with a date of birth of 08/12/1987. During the traffic stop, Espinoza provided his home

15

address as 2218 S. 21st Street, Milwaukee, WI and provided the phone number (262)224-4619 (**Target Cell Phone**). Espinoza was issued a warning and released. Later, on February 13, 2024, case agents observed the phone location/ping data for phone number (414)688-7554 was showing that the device was in an area of Butler, Wisconsin. Case agents traveled to that location and observed the same grey Honda parked in a parking lot. As a result, case agents believe that Espinoza was in possession of phone number (414)688-7554 despite failing to identify that as his number during the traffic stop.

37. On February 14, 2024, case agents used a reliable a law enforcement database to locate a traffic stop and arrest from the Oak Creek Police Department in 2011 where Juan C. Espinoza was arrested. Case agents were able to compare booking photographs from 2011 and photos taken from the body camera footage of the traffic stop on February 13, 2024, and positively identified Juan C. Espinoza.

38. On February 24, 2024, at approximately 1:27 PM, an outgoing text message was intercepted on the court ordered intercept (TIII) for Medel's phone ((414)499-6919) to Espinoza at (262)224-4619 (**Target Cell Phone**). This conversation was intercepted in Session #367, 368, 369, and 370 and was translated by an FBI linguist.

> **Marco Medel (TT2)-** Bring me 14 to the Infierno! 2 separate dudes.
> **Espinoza (4619)** (**Target Cell Phone**)- Alright dude, just give me a chance in what I head over dude.
>
> **Marco Medel (TT2)-** Well, don't take long.
> **Espinoza (4619)** (**Target Cell Phone**)- No dude.

39. Case agents believe this conversation is Medel telling Espinoza to bring 14 ounces of cocaine or methamphetamine to El Infierno to deliver the narcotics to two different customers. I

16

believe this conversation shows Espinoza utilizing (262)224-4619 (**Target Cell Phone**) to conduct narcotics transactions via text message.

40.     On March 4, 2024, at approximately 10:19 AM, an outgoing call was intercepted on the court ordered intercept (TIII) for Medel's phone ((414)499-6919) to Espinoza at (262)224-4619 (**Target Cell Phone**).  This conversation was intercepted in Session #1742 and was translated by an FBI linguist.

> **Marco Medel (TT2)-** Right now, on 8th at Salas
> **Espinoza (4619)** (**Target Cell Phone**)- I will be over there in a half hour bro.
> **Marco Medel-** Hey wake up (Negrito) Negro and tell him to hit me up.
> **Espinoza (4619)** (**Target Cell Phone**)- Ok
> **Marco Medel (TT2)-** Bye

41.     I believe this conversation represents Medel calling Espinoza at (262)224-4619 (**Target Cell Phone**).  I believe Espinoza is utilizing (262)224-4619 (**Target Cell Phone**) to speak with members of the Botello DTO, specifically Medel and Aviles-Rogel.  I believe Espinoza is actively setting up a meeting between Aviles-Rogel through Medel due to Aviles-Rogel not answering Espinoza's phone calls or messages.  I believe this conversation, along with many others intercepted by case agents, shows Espinoza using (262)224-4619 (**Target Cell Phone**) and (414)688-7554 interchangeably.  The FBI linguists along with case agents have listened to multiple phone calls from (414)688-7554 and identified the same voice utilizing (262)224-4619 (**Target Cell Phone**).

42.     On March 7, 2024, at approximately 9:37 AM, an incoming call was intercepted on the court ordered intercept (TIII) for Medel's phone ((414)499-6919) from David Gavinski (414-915-6999 and hereafter "UM6999")) to Medel (414-499-6919).  Case agents believe that 414-915-6999 is a phone associated with Gavinski because TFO David Cabral conducted a law enforcement

17

database check of 414-915-6999 utilizing a program called "Clear" Case agents know "Clear" is an investigative database used by law enforcement to obtain information in furtherance of a criminal case. Case agents know that Clear is a Thomas Reuters product and assists law enforcement with quickly identifying victims and persons of interest through current and historical content including phone numbers which have been used in the past and are currently being used. On March 7, 2024, TFO Klarkowski observed a Dodge Caravan park on the slab behind 2630 S 7th Street during the above interceptions. TFO Klarkowski observed the Caravan to have a Wisconsin License Plate of KB3160 attached to the rear. TFO Klarkowski conducted a check through the Department of Transportation which revealed that the vehicle was registered to David Gavinski and listing to the Caravan. TFO Klarkowski later observed a photograph from the Department of Transportation of the registered owner and confirmed that Gavinski was the driver of the Caravan, who met with Medel. During this call, UM6999 advises Medel that after his (UM6999's) treatment, he has the documents for Medel to sign. Case agents knew based on a previous interception over Medel's line that UM6999 was meeting with Medel to pick up four "onions" (which, in context, case agents believe based on training and experience in drug investigations means four ounces of cocaine) from Medel. At approximately 11:12 AM Medel asked UM6999 to let him know what time so he can be ready.

43. At approximately 11:13 AM, a call was intercepted on the TIII on (414)499-6919 outgoing from Medel to Juan Espinosa aka Pedrito/Gordo (at **262-224-4619** --Target Cell Phone). This intercepted call was translated by an FBI linguist.

> **Espinoza (4619)-** Hey
> **Marco Medel (TT2)-** What are you doing?
> **Espinoza (4619)-** I am just now waking up, you?

**Marco Medel (TT2)-** Same bro, I am going to shower now.  I just got a message from the white guy that he is going to stop by today.

**Espinoza (4619)-** Ok, what is it that you mentioned to me yesterday, that he wanted 4 or 9?

**Marco Medel (TT2)-** He wants 4 bro, but ya he wants 4.

**Espinoza (4619)-** Ok that's fine bro.

**Marco Medel (TT2)-** So that would make it 5, I don't know if getting the 9 would come out cheaper.

**Espinoza (4619)-** Do you want 1 separately?

**Marco Medel (TT2)-** From the 4 of the white guy, yes, lets just wait and only give him the 4.

**Espinoza (4619)-** Ok bro.

**Marco Medel (TT2)-** He said he is going to have that before he leaves, right now I believe he is just going to bring me what is due.  Then by next week he will have the amount for the 4.

**Espinoza (4619)-** Ok that's fine, what time is he coming?

**Marco Medel (TT2)-** I just read the message, after treatment, but it is always around noon.

**Espinoza (4619)-** Let me get up then.

**Marco Medel (TT2)-** Let me get in the shower.

44.    Case agent believe this conversation represents Medel telling Espinoza the Guero (White guy) just sent a message and wants to pass by today.  Espinoza stated he was just getting up.  Pedr Espinoza ito asks if the guy wants 9 or 4? Medel said the guy wants 4. Medel tells Espinoza it will be 5. Medel does not know if he should grab the 9 because it is cheaper. Medel says only the 4 will be given to the guy [in context, UM6999]. Medel says the guy [in context, UM6999] will bring what he owed and is leaving next week and will have for the 4.  Espinoza questions what time and Medel thinks it will be after UM6999's treatment, around 12. The

19

interception was a telephone voice conversation held in Spanish and was translated using FBI Linguists.

45. A group of outgoing SMS messages were sent from Medel (and intercepted via the TIII on Medel's line) to Espinoza at (262)224-4619 (**Target Cell Phone**) and was intercepted at approximately 11:36 AM. This group of SMS text messages (Session #'s 2040 through 2045) were translated by an FBI Linguist.

> **Marco Medel (TT2)-** He's coming.
> **Espinoza (4619)** (**Target Cell Phone)-** Ok, I am on my way, the 5 or 4 after all.
> **Marco Medel (TT2)-** 5
> **Espinoza (4619)** (**Target Cell Phone)-** Ok
> **Marco Medel (TT2)-** He'll be there in 10 minutes.
> **Espinoza (4619)** (**Target Cell Phone)-** Ok

46. In context, case agents believed that this group of SMS messages is referencing UM6999 going to Medel's residence to pick up four ounces of cocaine. Espinoza responds at approximately 11:36 AM stating that he (Espinoza) is on his way, the 5 or 4, after all. Due to my training and experience along with my knowledge of this case, I believe "the 5 or 4, after all" is referencing 5 or 4 ounces of narcotics). Medel responds advising Espinoza to bring 5, due to my training and experience along with my knowledge of this case, I believe Medel instructed Espinoza to bring 5 ounces of narcotics) and that UM6999 would arrive in ten minutes.

47. At approximately 11:47 AM, Espinoza is observed on pole camera and by physical surveillance exiting his residence and entering his gray jeep. Physical surveillance conducted a follow of Espinoza to Medel's residence located at 2630 S. 7th Street, Milwaukee, WI.

20

48.    Physical surveillance observed a Dodge Caravan (WI/KB3160) that lists to David Gavinski, arrive in the alley behind Medel's residence at approximately 11:53 AM.

49.    At approximately 11:58 AM, physical surveillance observed Medel approach the driver's side door of Espinoza's Jeep and conduct a hand-to-hand transfer of a large item. Medel was then observed walking out of view in the alley. At approximately 12:07 PM, Medel returned to Espinoza's Jeep and entered the passenger seat. The Jeep left northbound out of the alley, followed by the Dodge Caravan registered to David Gavinski. Physical surveillance was able to positively identify the driver of the Caravan as Gavinski.

50.    Based on the content of the intercepted calls/messages, preliminary subscriber information, and other information, case agents believe the user of the Target Cell Phone uses the name/nicknames of Pedrito and Gordo and was later identified as Juan Carlos Espinoza.  The listed subscriber for the Target Cell Phone is "Edgardo Isidro."

51.    On March 15, 2024, case agents intercepted a voice call followed by electronic messages between Medel and Juan Carlos Espinoza via (262)224-4619 (**Target Cell Phone**). Based on my knowledge of this investigation and the context of the calls, I believe they are discussing a narcotics transaction. The conversation was in Spanish and translated to English.

### Voice Call 4:02 PM

**Medel:** Hey.

**Espinoza:** Where are you at?

**Medel:** I'm here at home.

**Espinoza:** You didn't even go out yesterday, right?

**Medel:** No man.

**Espinoza:** Nor the day before yesterday?

**Medel:** Not then either.

21

**Espinoza:** [Laughs] What did-did Vero forgive you already or what?

**Medel:** No, What the fuck. It's just that I was really sick man. I'm going to take a shower right now and I am going to need a half now man. There already calling me.

**Espinoza:** Yeah, alright, where do I meet you? At your house or at El Infierno?

**Medel:** Uh well in about how long?

**Espinoza:** Uh, there just doing my eyebrows. I'm almost out here in about 15-20 minutes.

**Medel:** Uh yeah man. I'll wait here for you.

**Espinoza:** Where?

**Medel:** Here, so you can take me over there.

**Espinoza:** At your moms or at your house?

**Medel:** No-no at mine.

**Espinoza:** All right man.

**Medel:** Look I'll let you know because Vero isn't here yet, se went for…

**Espinoza:** Alright man

**Medel:** I'll let you know once she gets here because I have the girl.

**Espinoza:** All right man.

**Medel:** All right.

52. I believe this conversation represent Medel asking Espinoza to pick him up and bring a "half." I know "half" is a street reference to amount of narcotics. I believe Medel was asking for a half since he was sick yesterday and people were asking him for narcotics.

**Message Exchange 4:12 PM – 4:30 PM**

**Medel:** I'm ready now

**Espinoza:** Ok

**Medel:** Almost?

**Espinoza:** Yes

22

53.     I believe these messages represent Medel telling Espinoza that he is ready for Espinoza to come over with the narcotics previously discussed. I believe Medel is then asking Espinoza if he is almost to Medel and Espinoza replies yes indicating that he is almost there. Physical surveillance then observed Espinoza pulling into the alleyway behind Medel's residence.

54.     On March 15, 2024, at approximately 6:16 PM case agents observed Espinoza arrive at 2218 S. 21st Street in his Jeep. Case agents observed Espinoza exit his vehicle and retrieve a large black duffel bag which appeared to be heavy from a female who brought it outside. Pole camera footage shows Espinoza enter the Jeep with the duffel bag and drive eastbound in the alley towards the rear of his residence. Pole camera footage shows Espinoza stop at the rear of the residence and exit the Jeep with the large black duffel bag. Espinoza exits the camera view for a few moments and enters the rear passenger door of the Jeep with the black duffel bag. It appears Espinoza is hiding or concealing the contents of the bag somewhere in the rear of the vehicle. Espinoza enters the front driver seat and drives away eastbound in the alley. I believe this large black duffel bag contained a large amount of money or a combination of money and narcotics.

55.     Case agents believe these observations in conjunction with phone call analysis showing different unknown numbers in communication with Espinoza at (262)224-4619 (**Target Cell Phone)** is indicative of Espinoza setting up a possible money drop or exchange for narcotics currently purchased or previously purchased. During this incident, case agents were actively tracking Espinoza's first phone, (414)-688-7554, but case agents have discovered Espinoza will leave that phone behind and only bring his second phone (262)224-4619 (**Target Cell Phone)**. I conducted a pen analysis and observed Espinoza answering and actively using (262)224-4619 (**Target Cell Phone)** after he left with the large black duffel bag. I looked at the location of

23

(414)688-7554 after Espinoza left 2218 S. 21st Street with the large black duffel bag and discovered the phone never left the area.

56.    On March 16, 2024, I conducted phone toll analysis of Espinoza's phone number (262)224-4619 (**Target Cell Phone)** regarding text messages and calls utilizing this phone. I discovered (262)224-4619 (**Target Cell Phone)** has made 767 incoming and outgoing electronic text messages in the last month including to Medel and Aviles-Rogel's phones. I discovered (262)224-4619 (**Target Cell Phone)** has made 1411 incoming and outgoing phone calls in the last month including to Medel and Aviles-Rogel's phones. This shows Espinoza utilizing this phone to currently call and electronically text members in the Botello DTO in conjunction with his other phone number (414)688-7554. I know U.S. Cellular retains historical cellular information including text messages that will go back five days from the last use. Due to Espinoza leaving his primary phone (414)688-7554 at his residence during incidents involving transport or pick up of narcotics or money, I am requesting this historical cellular data and last five days of actual text message content in order to possibly identify Espinoza's stash locations, pick up or drop off locations, and any outside narcotics broker he might be conducting business with.

57.    I believe that this order for Espinoza/Gordo/Pedrito's phone records (262)224-4619 (**Target Cell Phone)** and data will further this investigation. The location data associated with the **Target Cell Phone** will assist case agents in conducting targeted physical surveillance and further identifying the locations and individuals associated with this DTO and the nature and scope of Espinoza/Gordo/Pedrito's drug trafficking activities. For example, case agents believe that it will be valuable to their investigation to have ongoing precision phone location information for this phone (Target Cell Phone) because it will help case agents, identify the user's stash locations for

24

methamphetamine and other controlled substances, and determine when the user is with other known DTO members (case agents currently have court orders authorizing similar pings/ongoing precision phone location information on phones associated with Aviles-Rogel, Marco Medel, and other DTO members), so that case agents can conduct physical surveillance and other investigative operations at that location.

58. Evidence obtained during this investigation leads case agents to believe that Espinoza/Gordo/Pedrito operates the **Target Cell Phone**. I conducted a cell phone provider check and the service provider for the **Target Cell Phone** is US Cellular.

59. Case agents are requesting this warrant authorizing a collection of data related to the **Target Cell Phone** for 30 days to identify the user, identify the users frequented addresses, further investigate the user's activities, and to identify locations to which the user is traveling to further his drug distribution trafficking activities.

60. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that the user of (262)224-4619 (**Target Cell Phone)**, Espinoza/Gordo/Pedrito, is engaged in the trafficking and distribution of controlled substances and is using the **Target Cell Phone** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phone** will assist case agents in determining the user's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

61. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

62. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; and (4) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

26

63. I further know that some service providers can collect timing advance or engineering data commonly referred to as, RTT, Timing Advance, LOCDBOR, or equivalent. This engineering data provides a distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate geographic area that is more precise than cell-site data alone.

**E-911 Phase II / GPS Location Data**

64. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**Subscriber Information**

27

65.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

66.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

67.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

68.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may

28

be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

69. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

70. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

29

# ATTACHMENT A

## Property to be Searched

1. Records and information associated with the cellular device assigned call number 262-224-4619 (referred to herein and in Attachment B as the "**Target Cell Phone**"), used by Juan Carlos Espinoza, aka Gordo aka Pedrito, with a listed subscriber of "Edgardo Isidro" that is in the custody or control of U.S. Cellular (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 8410 West Bryn Mawr Avenue, Chicago, Illinois 60631.

2. The Target Cell Phone.

**ATTACHMENT B**

**Particular Things to Be Seized**

Pursuant to an investigation of Juan Carlos Espinoza, aka Gordo, aka Pedrito, for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), this Warrant authorizes the officers to whom it is directed to determine the location of the **Target Cell Phone** by collecting and examining the following:

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a.    The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 6, 2024, to the present:

   i.  Names (including subscriber names, usernames, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long-distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

31

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 6, 2024, to the present including:

  a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

  i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

  ii. Source and destination telephone numbers;

  iii. Date, time, and duration of communication; and

  iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication,

32

as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), involving Juan Carlos Espinoza, aka Gordo, aka Pedrito, and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly

described in this Warrant.

34

Case 2:24-mj-00360-SCD    Filed 03/20/24    Page 41 of 43    Document 1

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T. The attached records consist of _____.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T and they were made AT&T as a regular practice; and

b. Such records were generated by AT&T's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by AT&T and at all times pertinent to the records certified here the process and system functioned properly and normally.

35

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____
Date

_____
Signature

36